Kathleen L. Wieneke, Bar #011139
Lori L. Voepel, Bar #015342
Michele Molinario, Bar #020594
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
Telephone: (602) 263-1700
Fax: (602) 200-7858
kwieneke@jshfirm.com
mmolinario@jshfirm.com

Attorneys for Defendants City of Phoenix
and Ronald Jones

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| BYRON TENNYL LACY, an unmarried man, and DEBRA ANN FINLEY, his mother; BRAYVON T. LACY, minor child of Byron Tennel Lacy,<br><br>           Plaintiffs,<br><br>v.<br><br>COUNTY OF MARICOPA; THE CITY OF PHOENIX; PHILLIP KEEN, M.D. and JANE DOE KEEN, RONALD JONES and JANE DOE JONES; KENNY HANSEN and JANE DOE HANSEN; LEE GARRETT and JANE DOE GARRETT; JOHN DOE GIESZL and JANE DOE GIESZL, et al.,<br><br>           Defendants. | NO. CV06-2865-PHX-FJM<br><br>**DEFENDANTS CITY OF PHOENIX AND JONES' SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

Defendants City of Phoenix and Detective Ronald Jones, pursuant to Rule 56, Fed. R. Civ. P., file their Separate Statement of Facts and attached Exhibits in Support of their Motion for Summary Judgment.

      1.     This case arises out of a shooting that occurred on May 1, 1994. (*See* First Amended Complaint at ¶ 29; *see also* Transcript of Grand Jury Proceedings dated January 25, 1995, attached hereto as Exhibit 1 at 6). Sister's Auto Club, a nightclub, was located at 1245 East Broadway Road, in Phoenix, Arizona. (*Id.*)

1931790.1
6/24/08

2. Plaintiff Byron Lacy, and three of his friends, were in a white Volvo station wagon, attempting to exit the Sisters' parking lot, but another vehicle was "blocking" their exit. (*See* First Amended Complaint at ¶ 29; *see also* Exhibit 1 at 11). Plaintiff was seated in the rear passenger side of the station wagon. (*See* First Amended Complaint at ¶ 30).

3. Plaintiff admits that the driver of the white Volvo station wagon "drew a pistol and fired a warning shot into the air." (*See* First Amended Complaint at ¶ 29).

4. Plaintiff further admits that he "extended his .45 caliber semi-automatic handgun out of the rear passenger window and also fired warning shots …." (*See* First Amended Complaint at ¶ 30).

5. Danny King was driving the vehicle that was allegedly "blocking" the white Volvo from exiting Sister's parking lot. (Exhibit 1 at 8). According to Detective Ronald Jones, the assigned "case agent," Mr. King reported that he had been at Sister's, and was preparing to leave. (*Id.*). As he did so, he parked his vehicle in the roadway, as his passengers exited his vehicle to talk to a girl by the curb. (*Id.*). Mr. King put on his vehicle's four-way flashers. (*Id.*).

6. Mr. King reported that while he was waiting for his passengers to get back in his car, he heard "a horn honking and yelling from behind him." (*Id.*). This was immediately followed by at least two gunshots, which caused Mr. King to duck down. (*Id.*).

7. After the initial shooting stopped, Mr. King sat up and observed a white station wagon passing him slowly. (*Id.*). As the station wagon passed him, Mr. King noticed an arm come out of the passenger-side window. (*Id.*). He noticed the person was holding a handgun and Mr. King watched as the individual fired shots towards Sister's. (*Id.*).

8. The vehicle blocking the white Volvo's exit out of the Sister's parking lot allegedly moved at that point, and the Volvo exited the parking lot, heading

eastbound on Broadway.  (*See* First Amended Complaint at ¶ 30; *see also* Report of Detective Ronald dated April 4, 2008, Bates labeled COFP02237-2242, attached hereto as Exhibit 2, at COFP02239).

9. Shawn Mayon, a Sister's security guard, was killed by a single gunshot wound to the head while he stood in the parking lot of Sister's. (*See* Exhibit 2 at COFP002239; Exhibit 1 at 9-10).

10. Phoenix Police received a 911 call at or about 4:00 a.m. on May 1, 1994, advising that a shooting had occurred.  Officers arrived at Sister's nightclub just minutes after 4:00 a.m. on May 1, 1994.  (*See* Exhibit 2 at COFP02239).

11. Witnesses at the scene provided their accounts of the shooting to the officers who arrived on scene.  (*See* Exhibit 2 at COFP02239).  They told officers that shots had been fired by occupants of a white Volvo station wagon as it exited the Sister's parking lot.  (*Id.*).  The witnesses all reported that they heard a series of shots, followed by a pause, and then more shots.  (*Id.*).

12. Shawn Mayon and Calvin Pink, Sr., another security guard at Sister's, were struck during the second burst of fire. (*Id.*). Mr. Mayon died from his wound, while Calvin Pink, Sr. survived, though injured. (*Id.*).

13. Phoenix Police dispatch issued the description of the white Volvo station wagon over the radio.  (*See* Exhibit 1 at 10).

14. Officers observed a white Volvo station wagon traveling northbound on 24th Street and Hess, and stopped the Volvo around 4:26 a.m. at the County Hospital on 24th and Roosevelt. (*See* Exhibit 1 at 10; *see also* Exhibit 2 at COPF02239).

15. A witness from the scene, Mr. Austin, was taken to the location of the Volvo.  (*See* Exhibit 1 at 10).  Mr. Austin verified that the white Volvo station wagon officers had stopped at the County Hospital was the same white Volvo station wagon that was seen exiting Sister's parking lot following the shooting.  (*Id.*).

16. The white Volvo station wagon stopped at the Hospital had four occupants, including Plaintiff Byron Lacy (indicated in the grand jury transcript as Byron

"Finley," as this was the name that Plaintiff misreported to police at the time of the stop). (*See* Exhibit 1. at 11; *see also* Exhibit 2 at COFP02239).

17. Officers searched the vehicle and found two guns—a 9 millimeter high-point semiautomatic, and a .45 caliber pistol, located in the vicinity of where Byron Lacy had been sitting in the rear of the Volvo. (*See* Exhibit 1 at 11; *see also* 2 at COFP02239).

18. Byron Lacy admitted to officers that he owned the .45 caliber pistol. (*See* Exhibit 1 at 11).

19. One of the other passengers, Torron Jarrett, indicated he owned the 9 millimeter. (*See* Exhibit 1 at 11).

20. Detective Jones interviewed Lacy, and the other passengers of the white Volvo station wagon later that night. (*See* Exhibit 2 at COFP02239).

21. The four men's versions of events all had a "common thread:" all admitted to being at Sister's, leaving in the white Volvo, trying to exit the parking lot and being unable to do so, as a result of a car blocking one lane of the roadway. (*See* Exhibit 1 at 12; *see also* Exhibit 2 at COFP02239).

22. Additionally, Mr. Lacy admitted to Detective Jones that he "raised his arm out the window and fired numerous shots from his .45 caliber out the passenger side window towards the Sister's social club." (*See* Exhibit 1 at 12). This was corroborated by the driver of the white Volvo, Michael Edwards. (*Id.*).

23. Lacy said that it was possible he fired his weapon continuously from when he extended his arm sideways out the window, upwards towards the sky, and then back down again. (*See* Byron Lacy's deposition transcript, attached hereto as Exhibit 3 at 62-64).

24. Mr. Jarrett admitted that he was the first to fire, holding his gun out of the passenger side front window and firing three shots into the air, in an effort to clear the roadway. (*See* Exhibit 1 at 3).

25.	Seven .45 caliber shell casings were found in the roadway (Broadway) at the scene, most in the curb lane of eastbound Broadway Road. (*See* Exhibit 1 at 13). Other casings were located in a vacant field, and in the white Volvo itself. (*Id.*).

26.	Nine shell casings were recovered from the white Volvo in which Lacy was riding. (*Id.*).

27.	Additionally, Detective Orona found a copper, fully-jacketed bullet next to a pay phone outside Sister's. (*Id.*; *see also* Exhibit 2 at COFP02240). Detective Jones placed the bullet in a closed, clear plastic vial. (*See* Exhibit 2 at COFPD02240).

28.	This is the same pay phone that Calvin Pink, Sr. reported using to call 911 following the shooting. (*See* Exhibit 1 at 7-8; *see also* Exhibit 2 at COFP00240).

29.	Detective Jones was still conducting interviews at the time Detective Orona located the bullet; he therefore asked that Detective Orona and Detective Hansen take the bullet to the lab. (*See* Exhibit 2 at COFP00240).

30.	The shell casings on the ground were between 130 and 200 feet away from where Shawn Mayon's body lay. (*Id.* at 14).

31.	Detective Jones testified to the above facts during his testimony before the grand jury on January 25, 1995. (*See, generally*, Exhibit 1).

32.	Detective Jones told the grand jury that he personally delivered the shell casing found by the phone booth to Phoenix Criminalist Lee Garret, who performed initial ballistics tests to compare the casing to the 9 mm and .45 caliber handguns retrieved from the white Volvo. (*Id.* at 14).

33.	Criminalist Garrett determined that the spent copper-jacketed bullet found by the phone booth outside Sister's had been fired from the same .45 caliber weapon which Byron Lacy admitted he owned. (*See* Exhibit 1 at 15).

34.	Criminalist Garrett also determined that of the seven casings found in on Broadway Road, all were either fired from Lacy's weapon, or were entirely consistent with being fired from his weapon. (*Id.*).

35. Calvin Pink, Sr.'s shirt, which was torn adjacent to the lapel, was also submitted to the crime lab for testing. (*Id.*). Criminalist Garrett determined that materials around the tear were copper, and were consistent with a copper projectile going through the fibers of Mr. Pink, Sr.'s shirt. (*Id.*).

36. Trace evidence, including human blood and a speck of tissue, were found on the tip of the bullet. (*See* Exhibit 1 at 15-16).

37. Blood and tissue were also found on those portions of Mr. Pink, Sr.'s shirt where the bullet went through. (*Id.*).

38. Criminalist Ray Gieszl tested the bullet for the presence of blood using the Kastle-Meyer blood detection test. (*See* Exhibit 1 at COFP02240). The test was positive for blood. (*Id.*).

39. Ultimately, the spent copper bullet (projectile) and Mr. Pink, Sr.'s shirt, and blood samples from Calvin Pink, Sr. and Mr. Mayon were submitted to a lab (Forensic Science Associates of California) for D.N.A. testing. (*See* Exhibit 1 at 16).

40. According to Detective Jones' grand jury testimony, Forensic Science Associates determined that the tissue found on the tip of the bullet belonged to Calvin Pink, Sr., while the tissue around the bullet hold on Mr. Pink's shirt was that of Mr. Mayon. (*Id.*).

41. In September of 1994, Criminalist Jennifer Mihalovich of Forensic Science Associates advised Detective Jones that the DQ Alpha Type from the known blood of Shawn Mayon and the tissue from the shirt of Calvin Pink were from the same source. (*See* Exhibit 1. at COFP02241). The DQ Alpha Type from the known blood of Calvin Pink, Sr. and the tissue found on the bullet are from the same source. (*Id.*).

42. Following his analysis of the evidence, Criminalist Lee Garrett opined that Mr. Lacy began firing his gun out the Volvo passenger window, beginning by pointing it down, and then pointing it all the way straight up, and then back down. (*See* Exhibit 1 at 18; *see also* Exhibit 3 at 63-64).

1           43.     At the grand jury, Detective Jones also testified that the Maricopa County Medical Examiner, Dr. Phillip Keen, performed the autopsy on Mr. Mayon. (*See* Exhibit 1 at 12).

           44.     Dr. Keen determined that a single gunshot wound was the cause of death. (*See* Exhibit 1 at 13). The shot entered from the nose and exited at the base of Mr. Mayon's skull, slightly to the left of center, meaning the shot came forward and slightly to the left. (*Id.*).

           45.     Plaintiffs' First Amended Complaint alleges that Detectives Jones and Hansen breached a duty to "immediately bag, tag, impound and inventory the .45 caliber bullet …." (*See* First Amended Complaint at ¶ 97). Plaintiffs specifically claim that Operational Orders 8.1.6(Q) and 8.1.6(7)(a) were violated. (*Id.*).

           46.     Neither of these orders were in effect at the time of Mr. Mayon's shooting in May of 1994. (*See* Exhibit 1 at COFP02238). These orders were implemented in 1999. (*Id.*).

           47.     Detectives Jones, Hansen, and Orona identified, collected, inventoried, secured, packaged and documented all evidence within an official department report. (*Id*).

           48.     Detective Orona identified the bullet in his scene investigation, photographed its location, identified its physical location, properly collected evidence by placing the item in a clear plastic vial, and then sealed the vial with a covered lid (*Id.*).

           49.     The bullet was then taken to the lab for examination as for the size, caliber, and possible type of weapon that may have fired the bullet. (*Id.*).

           50.     All actions conducted by Detectives Jones, Hansen, and Orona were in conformance with policies relating to impounding property in effect at the time. (*Id.*).

           51.     Detective Jones directed Detective Orona to take the bullet to the lab, as the "timing of this information [the scientific analysis] was critical and necessary." (*Id.*).

52. No Phoenix Police Department policy precluded an investigator from utilizing crime lab staff for their technical expertise with crime scene evidence. (*Id.*).

53. In fact, such a practice is routine in violent crimes. (*Id.*).

54. Bennie Click, Defendants' police procedures expert, opines as follows in this case:

    (a) The detention and arrest of Byron Lacy (Finley) was made in a manner consistent with nationally recognized police policy and training standards regarding probable cause and met the standard of care.

    (b) The investigation of the homicide of Shawn Mayon and the assault on Calvin Pink, Sr., was conducted in a manner consistent with nationally recognized police policy and training standards.

    (c) The physical evidence in this case was identified, collected, documented, evaluated, analyzed and stored in a manner consistent with nationally recognized police policy and training. It also met the standard set forth in the Phoenix Laboratory Policy and Physical Evidence Manuals.

(*See* Expert Report of Bennie Click dated April 3, 2008, attached hereto at Exhibit 4, at 6).

55. After considering the facts outlined above, based on his thirty-two (32) years of law enforcement experience, Defendant Jones believed probable cause existed to arrest Lacy for several crimes ranging from the reckless discharge of his weapon, to aggravated assault, to homicide. (*See* Exhibit 2 at COFP02240).

56. Lacy was indicted on January 25, 1995. (*See* Exhibit 5).

57. In a March 23, 1995 minute entry, the trial court denied Lacy's Motion to Remand for New Finding of Probable Cause, and the trial in the case was confirmed. (*See* Minute Entry dated March 23, 1995, attached hereto at Exhibit 6).

58. Prior to the close of trial, Lacy's criminal defense attorney moved for a judgment of acquittal; the trial court denied this request. (*See* Transcript of Proceedings Continuing Jury Trial dated August 2, 1996, attached hereto as Exhibit 7, at 6).

59. Lacy was convicted by the jury of reckless manslaughter and aggravated assault. (*See* Verdict Forms, attached hereto as Exhibit 8).

60. Lacy appealed his convictions. (*See* Memorandum Decision from the Arizona Court of Appeals dated October 28, 1998 attached hereto at Exhibit 9). Therein, Lacy "accuse[d] the prosecutor of misconduct and the police of perjury. (*Id.* at 1).

61. The Court of Appeals denied Lacy's request for relief. (*Id.*). In so doing, the court specifically rejected Lacy's claim that his indictment was based on perjured testimony from Detective Jones. (*Id.*) The court stated that Lacy's allegations of discrepancies in Jones' testimony "raise[d] <u>no meritorious issue about grand jury perjury</u>." (*Id.*).

62. Lacy subsequently filed a Petition for Review of the Court of Appeals' affirmation of his conviction and sentence to the Arizona Supreme Court. (*See* Order and Mandate dated May 6, 1999, attached hereto at Exhibit 10). The Supreme Court denied the petition for review on April 12, 1999. (*Id.*).

63. Lacy filed a Petition for Post-Conviction Relief on December 15, 2000. (*See* Pro Per Petition for Post-Conviction Relief dated December 15, 2000, attached hereto at Exhibit 11). He argued ineffective assistance of counsel and insufficiency of evidence. (*Id.*).

64. On October 25, 2002, Judge Arellano issued a post-conviction order "setting aside the conviction of reckless manslaughter and aggravated assault against the defendant [Plaintiff]" based on ineffective assistance of counsel, and no reasonable trier of fact could have found Lacy guilty based on the evidence presented. (*See* Minute Entry dated October 25, 2002, attached hereto at Exhibit 12, at 3).

65. Subsequently, Judge Reinstein dismissed all charges against Lacy with prejudice, due to the fact that Lacy could not be retried due to double jeopardy concerns. (*See* Minute Entry dated February 27, 2003, attached hereto as Exhibit 13, at 2).

66. Maricopa County Medical Examiner Phillip Keen, M.D. testifies in his Affidavit (Doc. # 112-2 at 4), that he "independently formulated [his] report upon my physical examination of Mr. Mayon, my years of experience, and professional training."

67. In fact, Dr. Keen testifies that he never consulted, or conspired, with Detective Jones regarding his medical opinions related to the size of the exit wound. (*Id.*).

68. He goes on to testify that he "did not consult with, or conspire in any manner, with Detective Ronald Jones or any member of the Phoenix police department regarding the contents . . . of [the] autopsy report." (Doc. #112-2 at 4).

69. Additionally, Dr. Keen testifies that that he never conspired with Detective Jones, or any other member of the Phoenix Police Department, to change his autopsy measurements or testimony in an effort to "convict a black gang member." (*Id.*).

70. Detective Jones did not conspire with Dr. Keen, or with any City of Phoenix, or Maricopa County employee to deprive Plaintiffs of their constitutional rights. (*See* Exhibit 1 at 1).

71. Neither Lacy's race, or any alleged gang affiliation, factored into Detective Jones decision to investigate or arrest Lacy. (*Id.*).

72. Similarly, Detective Jones never testified before the grand jury regarding Lacy's race or any alleged gang affiliation. (*See* Exhibit 1; *see also* Exhibit 2 at COFP02242).

73. Defendants requested that Plaintiffs identify, with specificity, the policy or custom Detective Jones and/or the City of Phoenix violated. (*See* Plaintiffs' Response to Defendants' Non-Uniform Interrogatories, attached hereto at Exhibit 14, at 7). Plaintiffs merely referenced their First Amended Complaint and Initial Disclosure Statement, neither of which cite a policy or custom existing at the time of Mr. Mayon's shooting in 1994. (*Id.*).

1931790.1
6/24/08

10

DATED this 24th day of June 2008.

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ Kathleen L. Wieneke
Kathleen L. Wieneke
Michele Molinario
2901 North Central Avenue, Suite 800
Phoenix, Arizona  85012
*Attorneys for Defendants City of Phoenix and Ronald Jones*

## CERTIFICATE OF SERVICE

☒ I hereby certify that on June 24, 2008, I electronically transmitted the attached document to the Clerk's Office using CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

The Hon. Frederick J. Martone
Judge, United States District Court
401 West Washington
Phoenix, Arizona  85003

Richard T. Treon, Esq.
TREON, AGUIRRE & NEWMAN
2700 North Central Avenue, Suite 1400
Phoenix, Arizona 85004-1133
*Attorneys for Plaintiffs*

Randall R. Garczynski
Deputy County Attorney
Maricopa County Civil Division
 222 North Central Avenue, Suite 100
Phoenix, Arizona  85004-2206
*Attorneys for Defendants Maricopa County and Keen*

/s Erin E. Byrnes

1931790.1
6/24/08

11