**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| BYRON TENNEL LACY, an unmarried man; and DEBRA ANN FINLEY, his mother,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF MARICOPA; THE CITY OF PHOENIX; PHILLIP KEEN, M.D.; RONALD JONES,<br><br>Defendants. | No. CV-06-2865-PHX-GMS<br><br>**ORDER** |

Pending before the Court is the Motion for Summary Judgment of Defendants City of Phoenix and Ronald Jones. (Dkt. # 113.) For the reasons set forth below, the Court grants Defendants' motion for summary judgment.

**BACKGROUND**

**I.    Facts**[1]

On May 1, 1994, a shooting occurred at the "Sister's Auto Club," a nightclub located in Phoenix, Arizona. At approximately 4:00 a.m. that morning, Plaintiff Byron Lacy and

---

[1] Defendants move to strike "any and all statements in the Factual Background section [of Plaintiffs' Response] that lack a citation." (Dkt. # 167 at 12.) In responding to a motion for summary judgment, Plaintiffs cannot simply rely on allegations from their pleadings but must present facts supported by evidence demonstrating that a genuine issue of material fact exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986). To the extent Plaintiffs rely on unsubstantiated factual assertions in their Response, those assertions will be disregarded.

1  three of his friends attempted to exit the Sister's parking lot in a white Volvo station wagon.
2  A second vehicle, driven by Danny King blocked the Volvo's exit from the lot. One of the
3  individuals in the front seat of the Volvo drew a pistol and fired multiple warning shots into
4  the air. Plaintiff Lacy, who was sitting in the rear passenger seat, likewise extended his .45
5  caliber semi-automatic handgun out of the rear passenger window and fired multiple shots.
6  King reported hearing several gunshots, which caused him to seek cover. After the initial
7  series of shots, King reported that he sat up and observed the white station wagon proceeding
8  eastbound on Broadway. He then observed a person on the passenger side of the Volvo stick
9  his right arm out of the vehicle, point a handgun in the direction of the club, and fire
10 numerous shots.[2] Other witnesses testified to hearing initial shots followed by a pause and
11 then more shots. Shawn Mayon and Calvin Pink, security guards for the nightclub, were
12 struck by a bullet or bullets during the second series of shots.

13       Police responded to a 911 call, finding that Mayon had been killed by a single gunshot
14 wound to the head and Pink had been injured by a bullet that grazed his shoulder. Police
15 dispatch issued a description of the white Volvo over the radio. Shortly thereafter, Phoenix
16 Police stopped a white Volvo station wagon with four passengers – one of whom was
17 Plaintiff Byron Lacy. Ernest Austin, a witness from the scene of the shooting, was taken to
18 the Volvo and verified that it was the same vehicle that he had seen exiting the Sister's
19 parking lot at the time of the shooting. Lacy was arrested without incident under suspicion
20 of his involvement in the nightclub shooting. During a pat-down search, police found .45
21 caliber ammunition rounds in his left front pocket. Police also recovered .45 caliber shell
22 casings from inside the Volvo and a .45 caliber pistol from the rear seat.

---

[2]Plaintiffs object to Defendants Statement of Facts paragraphs 5-7 as an inaccurate paraphrasing of King's testimony. As a basis for the objection, Plaintiffs only reference an unauthenticated and unverified police report which may not be admissible evidence. The Court has nonetheless reviewed the police report containing King's statements and finds that paragraphs 5-7 are consistent with the report.

That afternoon, Detective Jones interviewed Lacy and the other passengers regarding the nightclub shooting. All four men admitted to being at Sister's, leaving in a white Volvo, and the shooting involved in their exit from the parking lot. Torron Jarret, who was seated in the front passenger seat, admitted to firing his 9 millimeter weapon first in an effort to clear the roadway. During Lacy's interrogation, he eventually admitted to ownership of the .45 caliber pistol and admitted that, earlier in the evening, he was at the nightclub parking lot and fired his weapon multiple times. Lacy contended several times that he shot five or six times into the air and did not shoot towards Sister's nightclub. However, Lacy eventually did admit that he may have fired his weapon horizontally.[3] Lacy stated:

> But I, man, I, I guess I shot it straight, I can't, man I, but, in my thinking in my mind is I shot in the air. I was drunk, it could have, it ain't hundred percent. If I take a urine test right now, I was full of alcohol but I did not mean to shoot nobody, I did not, if I did shoot straight the gun just you know on my way out probably pop, pop, pop, pop cause other then that I, I, I know I didn't mean to fire in no crowd of people.[4]

(Dkt. # 160 Ex. G at COFP01658.) After the interrogation, Lacy was released from custody.

During the police investigation, seven .45 caliber shells were found in the roadway, 130-200 feet from Mayon's body. Other casings were located in a vacant field. Phoenix Police Officer Orona found a fully-jacketed bullet next to a pay-phone outside the nightclub that Pink reportedly used to call 911 following the shooting. He placed the bullet in a closed,

---

[3] Plaintiffs argue that this statement was elicited in the interrogation due to Detective Jones' improper misrepresentation of facts and therefore is not reliable. Jones did misrepresent facts during Lacy's interrogation. Specifically, Jones told Lacy that the bullet that hit a security guard would be collected and that it was a .45 caliber bullet although Jones did not know this for certain. (Dkt. # 160 Ex. G at COFP01653-54.) Jones also may have lied when he told Lacy that he had "people that watched [Lacy's] arm, the white shirt come right out the window and point straight out towards that field." (*Id.* at 1640.) However, these misrepresentations do not rise to the level of establishing a coercive interrogation. *See United States v. Crawford*, 372 F.3d 1048, 1060-61 (9th Cir. 2004).

[4] Lacy also admitted this possibility in his deposition testimony. (Dkt. # 114 Ex. 3 at 62-64.).

1  clear plastic vial. Jones was conducting interviews at the time the bullet was found and
2  asked Orona and Detective Hansen to take the bullet to the lab.

3  On January 25, 1995, Jones testified at the grand jury proceedings that he delivered
4  the shell casing found by the phone booth to Phoenix Criminalist Lee Garrett, who performed
5  initial ballistics tests. Jones testified that Garrett determined that the bullet found by the
6  phone booth had been fired from Lacy's .45 caliber pistol and that the shell casings found
7  on the road were either fired from Lacy's weapon, or were entirely consistent with being
8  fired from his weapon. At the Grand Jury, Jones also testified that "Mr. Edwards (the driver
9  of the Volvo) and [Lacy] both agreed that [Lacy] raised his arm out the window and fired
10 numerous shots from his .45-caliber out the passenger side window towards the Sisters social
11 club." (Dkt. # 161 Ex. H at 12.)[5]

12 On January 25, 1995, a grand jury indicted Lacy on charges of murder in the first
13 degree and aggravated assault.[6] Based on the indictment, a warrant was issued and Lacy
14 arrested. Prior to trial, Lacy requested a remand for a new finding of probable cause. On
15 March 23, 1995, after reading the Grand Jury transcript and hearing arguments on the matter,
16 the court denied Lacy's motion. During July and August, 1996, Lacy was tried on murder
17 and aggravated assault charges. Prior to the close of trial, Lacy moved for a judgment of
18 acquittal arguing insufficiency of the evidence. The court denied the judgment for acquittal
19 stating, "Without commenting on the evidence, other than to determine whether or not there
20 is substantial evidence upon which reasonable minds could differ concerning the offense with

---

[5] Plaintiffs take issue with this testimony, asserting that this was perjury on the part of Jones. However, it is uncontested that in his initial interrogation, Lacy stated, "I guess I shot it straight." (Dkt. # 161 Ex. G at COFP01658.) Based on this statement, no issue of perjury is presented.

[6] Arizona Revised Statutes section 13-1203(A) defines assault as: "1. Intentionally, knowingly or recklessly causing any physical injury to another person; or 2. Intentionally placing another person in reasonable apprehension of imminent physical injury; or 3. Knowingly touching another person with the intent to injure, insult or provoke such person." An assault is aggravated if "the person uses a deadly weapon or a dangerous instrument." Ariz. Rev. Stat. § 13-1204.

- 4 -

1  which the defendant is charged[,] we order denying the judgment for acquittal." (Dkt. # 114
2  Ex. 7 at 6.)

3  Lacy was convicted of reckless manslaughter and aggravated assault and was
4  sentenced to seventeen years. Lacy appealed his convictions, arguing prosecutorial
5  misconduct and police perjury. Specifically, Lacy argued that the indictment was based on
6  perjury because Jones testified to the existence of a strike mark on the building behind Pink
7  and because Jones did not testify to Pink's statement that he heard a gunshot come from
8  across the street. The Arizona Court of Appeals held that neither argument raised
9  meritorious issues about grand jury perjury. Lacy's alternative arguments were also denied
10 and the conviction was affirmed. Lacy then filed a petition for review with the Arizona
11 Supreme Court. On April 12, 1999, the Arizona Supreme Court denied review. Lacy then
12 filed a petition for post-conviction relief in the Superior Court of Arizona in Maricopa
13 County. On October 25, 2002, the court granted the petition, set aside Lacy's conviction on
14 grounds of ineffective assistance of counsel and insufficient evidence, and ordered a new
15 trial. Upon reassignment, the court determined that a new trial was improper because double
16 jeopardy applied. Therefore, on February 23, 2004, the court dismissed the charges against
17 Lacy.

18 **II.    Procedural History**

19 In this action, filed July 29, 2006, Lacy alleges that the investigation of the crime, his
20 arrest, and his prosecution were improper and deprived him of his constitutional rights. The
21 Court previously dismissed counts seven, nine, and ten against Defendants City of Phoenix
22 and Jones. (Dkt. # 64.) Plaintiffs have since expressly abandoned counts five and six.
23 Accordingly, the following counts remain against Phoenix and Jones on which they now seek
24 summary judgment: (1) count one (breach of investigative policy); (2) count two
25 (mishandling of crime scene evidence and failure to report); (3) count four (lack of probable
26 cause); and (4) count eight (a derivative claim on behalf of Debra Finley for denial of
27 familial association). (Dkt. # 151 at 12-13.) On June 24, 2008, Defendants City of Phoenix
28

- 5 -

1  and Ronald Jones filed a motion for summary judgment seeking judgment on the remaining
2  counts.  (Dkt. # 113.)

## DISCUSSION

### I.  Summary Judgment Standard of Review

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Jesinger*, 24 F.3d at 1130. In addition, the dispute must be genuine, that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Citadel Holding Corp. v. Roven*, 26 F.3d 960, 964 (9th Cir. 1994).  The moving party need not disprove matters on which the opponent has the burden of proof at trial. *Celotex*, 477 U.S. at 323.

Thus, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)*; Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

### II.  Analysis

- 6 -

Title 42 of the United States Code section 1983 governs all remaining claims against these Defendants. Section 1983 creates a cause of action against a person who, acting under color of state law, deprives another of rights guaranteed under the Constitution.[7] It does not create any substantive rights; rather, it is a vehicle whereby plaintiffs can challenge actions by government officials. To prove a case under § 1983, Plaintiffs must demonstrate that (1) the action occurred under color of state law[8] and (2) the action resulted in the deprivation of a constitutional right or federal statutory right. *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). "A person deprives another 'of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which [the plaintiff complains].'" *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)).

**A.     Count One and Two – Breach of Official Policy/Breach of Duty**

Count one of Plaintiffs' Complaint alleges that the "City of Phoenix Defendants deprived Plaintiff Byron Lacy of his constitutional rights by knowingly violating official Phoenix Police Department policies on evidence gathering, impounding, inventorying, securing, and recording of the evidence." (Dkt. # 36 ¶ 87.) Count two alleges that "Detective Jones . . . breached [his] official duty to immediately bag, tag, impound and inventory the suspect .45 caliber bullet potentially carrying trace biological matter as required under Operational Order 8.1.6(Q), and to impound and inventory Plaintiff Lacy's .45 caliber

---

[7]42 U.S.C. § 1983 states, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other proceeding for redress . . . ."

[8]Defendants do not contest that the conduct at issue occurred under color of state law.

- 7 -

1  handgun as required under Operational Order 8.1.6(7)(a)." (*Id.* ¶ 97.) Both claims appear
2  to be asserted as municipal claims against the City of Phoenix.[9]

3  Lacy's first argument appears to be that the City is liable to Lacy for § 1983
4  violations because Lacy violated the City's policies and his official duties. However,
5  "liability . . . under § 1983 [requires] the identif[ication] [of] a municipal 'policy' or 'custom'
6  that *caused* the plaintiff's injury." *Bd. of County Comm'rs of Bryan County v. Brown*, 520
7  U.S. 397, 403-04 (1997) (emphasis added). The allegation that Jones violated Lacy's
8  constitutional rights because he violated existing City policy or because he violated his
9  official duties does not create § 1983 liability for the City. This is because Lacy's complaint
10 does not allege that City policy or custom itself caused the violation. Such allegations do not
11 support a § 1983 claim against the City. As such, Defendants correctly argue that Lacy
12 cannot show that an official policy or custom was the driving force behind any constitutional
13 violation. (Dkt. # 113 at 8-9.)

14 Second, Lacy appears to argue, in the alternative, that Jones' actions in violating City
15 policy and official duties themselves created City policy. *See Pembaur v. City of Cincinnati*,
16 475 U.S. 469, 484 (1986); *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 690-91
17 (1978). A litigant can establish a *Monell* claim in one of three ways:

---

[9]In the Order on February 1, 2008, which dismissed some of Plaintiffs' claims, the Court set forth which claims remained and, of the remaining claims, those which involved Defendants City of Phoenix and Jones. As to counts one and two, the Court merely stated that these claims remained against Defendants City of Phoenix and Jones. It is unclear whether counts one and two were intended to state a claim against Ronald Jones in his personal capacity. Defendants take the position that counts one and two assert municipal liability claims only and argue accordingly. In response, Plaintiffs similarly only argue that Detective Jones is an "official policymaker in conjunction with the investigation and prosecution of this action." (Dkt. # 151 at 11.) Based on this assertion, Plaintiffs argue a municipal liability claim. Regardless, even if Plaintiffs did seek to impose personal liability on Jones under counts one and two, summary judgment is proper. Plaintiffs fail to present sufficient evidence upon which a reasonable jury could conclude that Jones violated Lacy's constitutional rights during the collection, testing, and preservation of crime scene evidence.

- 8 -

> (1) by showing a longstanding practice or custom which constitutes the standard procedure of the local governmental entity; (2) by showing that the decision-making official was, as a matter of state law, a final policy-making authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (3) by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate.

*Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005); *see also Pembaur*, 475 U.S. at 484.

Plaintiffs rely only on the second prong of *Monell* in making their alternative argument, asserting that "municipal liability may be imposed for a single decision by a municipal policymaker under appropriate circumstances." (Dkt. # 149 at 12.) However, Plainitffs fail to argue or explain how Jones is a municipal policymaker or how his decisions resulted in municipal policy. Plaintiffs merely conclude that "because [of] Detective Jones' position as an official policymaker in conjunction with the investigation and prosecution of this action, the City may also be held liable." (Dkt. # 151 at 11.) However, "not every decision by municipal officers automatically subjects the municipality to § 1983 liability." *Pembaur*, 475 U.S. at 483. Otherwise, the municipal liability standard would be nothing more than *respondeat superior* – a standard that has been expressly forbidden by the Supreme Court. *Id.*

Municipal liability may attach against the City only if Jones is a final policymaker in the area of evidence collection, testing, and preservation, and his decisions in that area can be said to represent the official policy of the City. However, not only have Plaintiffs presented no evidence that Jones made any decisions involving evidence collection, testing, and preservation, but, even if Plaintiffs were to provide such evidence, they have presented no evidence upon which the Court could conclude that Jones had authority to establish police department or city policy or that his decisions at the crime scene and during collection, testing, and preservation of the evidence constituted the official policy of the City. *See Walker v. City of Orem*, 451 F.3d 1139, 1154 (10th Cir. 2006) (finding that an investigative officer was not a final policymaker for a county in terms of how an investigation is

conducted); *Webb v. Sloan*, 74 Fed. App'x 657, (9th Cir. 2003) (holding that plaintiff failed to present evidence to show that patrol officers are final policymakers). Therefore, because Plaintiffs have failed to raise a genuine issue of material fact relating to counts one and two, summary judgment is granted.

### B. Count Four – Lack of Probable Cause/Malicious Prosecution

In the Complaint, Plaintiffs assert that "by May 2, 1994, . . . under the totality of facts and circumstances[,] probable cause to maintain the investigation and prosecution of Plaintiff Lacy no longer existed, and that further prosecution of Lacy was illegal, malicious, and unconstitutional." (Dkt. # 36 ¶ 111.) Additionally, Plaintiffs assert that "absent probable cause, Plaintiff Lacy's prosecution was malicious, resulting in an unconstitutional conviction and false imprisonment, and deprived Plaintiff Lacy of his federal civil rights in violation of the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments." (*Id.* ¶ 114.)

After careful review of Plaintiffs' Response, it appears that Plaintiffs argue the following claims: (1) false arrest in violation of the Fourth Amendment; (2) continued detention without probable cause in violation of the Fourth Amendment (*i.e.*, false imprisonment); (3) malicious prosecution; and (4) fabrication of evidence in violation of the Fourteenth Amendment.[10] The arguments supporting these claims are based solely on Jones' testimony before the grand jury that indicted Lacy.

Indeed, much of Plaintiffs' argument is aimed at showing that Jones suppressed various exculpatory facts from the grand jury and misrepresented others during his testimony. Specifically, Lacy contents that the indictment was invalid because: (1) Jones suppressed

---

[10] Plaintiffs have raised no discernible arguments as to any deprivation of Lacy's Fifth, Sixth, or Eight Amendment rights. "Our circuit has repeatedly admonished that we cannot manufacture arguments [for a party] . . . . Rather, we review only issues which are argued *specifically and distinctly* . . . ." *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (internal quotations omitted and emphasis added). To the extent that Plaintiffs could argue any additional § 1983 claims arising in count five, they are considered waived by the Court for failure to address or argue how they may survive summary judgment.

- 10 -

1 evidence that DNA testing eliminated Mayon as the source of the tissue found on the bullet
2 linked to Lacy's gun and misrepresented the fact that the tissue found around the bullet hole
3 in Pink' shirt and the tissue found on the bullet itself were found to be the tissues of Mayon
4 and Pink respectively; (2) Jones suppressed evidence that gunshots had come from three
5 separate locations during the incident and that Ernest Austin, a security guard, fired six
6 rounds at a vehicle in the dirt lot adjacent to Sister's; (3) Jones suppressed evidence that the
7 bullets from Lacy's gun would take as long as 37 seconds to go up in the air and return to the
8 ground; and (4) Jones misrepresented Lacy's statement when testifying that Lacy admitted
9 to firing his weapon in the direction of Sister's.[11] (Dkt. # 5 at 10-11.)

10 In support of the first contention, Plaintiffs submit an unauthenticated DNA analysis
11 report from Forensic Science Associates which states that the DNA testing: (1) eliminated
12 Mayon as the source of the biological matter found on the bullet linked to Lacy's gun; (2)
13 found that the tissue collected from the bullet was a tissue type that occurs in eight percent
14 of the African American population and which is Pink's tissue type; and (3) found that the
15 tissue collected from Pink's shirt was a tissue type that occurs in three percent of the African
16 American population and which is Mayon's tissue type. This evidence may affect whether
17 probable cause existed to believe Lacy killed Mayon, but it does not weigh upon the probable
18 cause determination as to whether Lacy committed aggravated assault on Pink. In support
19 of the second contention, Plaintiffs submit several unauthenticated police reports that may
20 not be admissible at trial indicating that shots were fired from various locations during the
21 time period of Mayon's death. In support of the third contention, Plaintiffs submit the expert

---

[11]Plaintiffs also state that Jones lied to the grand jury about what witnesses "said regarding Lacy's arm having been observed coming out of the back of the seat of the vehicle and shooting five or six bullets directly back at Sister's." (Dkt. # 5 at 10-11.) Jones only testified that King "observed a white station wagon with a roof rack passing him slowly, and then observed an arm come out the passenger-side window with a handgun and fired numerous shots towards the social club." (Dkt. # 161 Ex. H at COFP01931.) The Court has read the grand jury record and finds no statement of Jones that indicates that a witness had seen Lacy's arm coming out of the back seat of the vehicle.

- 11 -

witness report of Luke Haag who conducted testing of .45 caliber bullets that were vertically discharged and who opines that the "nominal round trip flight times were all 37 seconds." (Dkt. # 161 Ex. I at 1.) Plaintiffs argue Jones should have disclosed those conclusions to the grand jury, as they may have related to the timing of the shots that caused Mayon's death. It appears, however, that Hagg's testing and conclusions were rendered years after Jones testified to the grand jury. Finally, in support of their fourth contention, Plaintiffs submit a record of Lacy's interrogation showing that Lacy told Jones several times that he shot his gun in the vertical direction, although he did, at one point, admit the possibility of shooting it in the direction of the nightclub.

Plaintiffs do not argue or present evidence that, subsequent to Lacy's arrest, Jones played a material role in the decision to prosecute Lacy. Nor do Plaintiffs argue or present evidence suggesting that Lacy's conviction was the result of misconduct on the part of Jones during Lacy's trial.[12]

Constitutional claims for false arrest, detention, and malicious prosecution under § 1983 are analyzed in light of analogous torts, such as false arrest and malicious prosecution. "[T]he ultimate and indispensable element of such [] claim[s] is the deprivation of a constitutional right." *Pierce v. Gilchrist*, 359 F.3d 1279, 1285-90 (10th Cir. 2004). In the present context, the constitutional right is the Fourth Amendment's right to be free from unreasonable seizures. Accordingly, the focal point of the Court's analysis is the probable cause supporting Lacy's arrest, detention, and prosecution.

### 1. False Arrest/Unlawful Detention

Probable cause to arrest or detain is an absolute defense to any claim under § 1983 against police officers for wrongful arrest or false imprisonment, as the lack of probable

---

[12]Plaintiffs do assert that Lacy's *conviction* was based on "fraud, perjury, or other corrupt means" (Dkt. # 151 at 6); however, Plaintiffs provide no argument or evidence suggesting that Jones engaged in any misconduct following the grand jury proceedings. The Court will therefore address only Jones' involvement in the investigation leading up to Lacy's arrest on January 25, 1995, including his testimony before the grand jury.

- 12 -

1 cause is a necessary element of each. *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th
2 Cir. 2006); *see also Hutchinson v. Grant*, 796 F.2d 288, 290 (9th Cir. 1986) (holding that "a
3 police officer has immunity if he arrests with probable cause"); *Cabrera v. City of
4 Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998) ("To prevail on his section 1983 claim
5 for false arrest . . . [the plaintiff] would have to demonstrate that there was no probable cause
6 to arrest him."). "Probable cause exists when the facts and circumstances within the officers'
7 knowledge and of which they had reasonably trustworthy information were sufficient to
8 warrant a prudent man in believing that the plaintiff had committed or was committing an
9 offense." *Hart v. Parks*, 450 F.3d 1059, 1065-66 (9th Cir. 2006) (citations and quotations
10 omitted). Generally, probable cause for an arrest "may be satisfied by an indictment returned
11 by a grand jury." *Kalina v. Fletcher*, 522 U.S. 118, 129 (1997) (citing *Gerstein v. Pugh*, 420
12 U.S. 103, 117 (1975)). This alone would normally extinguish the inquiry into Lacy's claims,
13 but here Plaintiffs question the validity of the indictment.

14 Here, no genuine issue of material fact exists as to whether probable cause existed to
15 arrest and detain Lacy on charges of aggravated assault wholly apart from the murder
16 charges. "Claims for false arrest focus on the validity of the arrest, not on the validity of
17 each individual charge made during the course of the arrest." *Price v. Roark*, 256 F.3d 364,
18 369 (5th Cir. 2001) (citing *Wells v. Bonner*, 45 F.3d 90, 95 (5th Cir. 1995)). "Thus . . . 'if
19 there was probable cause for any of the charges made . . . then the *arrest* was supported by
20 probable cause, and the claim for false arrest fails.'" *Id.* (quoting *Wells*, 45 F.3d at 95); *see
21 also Barry v. Fowler*, 902 F.2d 770, 773 n.5 (9th Cir. 1990); *Egolf v. Witmer*, 526 F.3d 104,
22 108 n.8 (3d Cir. 2008) ("[P]robable cause need only exist as to *any* offense that could be
23 charged under the circumstances."); *Johnson v. Knorr*, 477 F.3d 75, 85 (3d Cir. 2007) ("The
24 rationale of this rule is that 'the existence of probable cause for one offense . . . justifies the
25 arrest – and defeats the plaintiff's claim of false arrest – even if there was insufficient cause
26 to arrest on the second offense alone.'"); *Jaegley v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006)
27 ("[A] claim for false arrest turns only on whether probable cause existed to arrest a
28 defendant, and . . . it is not relevant whether probable cause existed with respect to each

individual charge."); *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994) ("Probable cause . . . exist[ed] as to any offense that could be charged under the circumstances.").

The following evidence for aggravated assault existed at the time of Lacy's arrest on January 25, 1995:[13]

1. Lacy was present at Sister's nightclub on the morning of the shooting and was in possession of a .45 caliber handgun.
2. While seated in the rear passenger seat of a white Volvo automobile that was departing Sister's parking lot, Lacy extended his .45 caliber handgun and fired it multiple times. During interrogation, Lacy admitted, "I guess I shot it straight" in the direction of the club.
3. King, a witness, observed a person on the passenger side of the Volvo stick his right arm out of the vehicle, point a handgun in the direction of the club, and fire numerous shots.
4. Pink was struck near the top of his right shoulder by a bullet.
5. Ballistics testing on a shell casing found by a nearby phone booth from which Pink placed a 911 call indicated that the casing was either fired from Lacy's handgun, or was entirely consistent with being fired from his weapon.
6. Biological matter was recovered from the shell casing and submitted for DNA testing. The DNA test concluded that the tissue was type 1.2, 1.2, which occurs in eight percent of the African-American population and is Pink's tissue type.[14]

---

[13]Detective Jones "believed probable cause existed to arrest Lacy for several crimes ranging from the reckless discharge of his weapon, to aggravated assault, to homicide." (Dkt. # 114 Ex. 2.)

[14]Plaintiffs submit expert witness reports of D.P. Van Blaricom and Gaylan Warren. Specifically, both experts dispute whether probable cause existed to believe that Lacy was responsible for Mayon's murder. However, because Plaintiffs' disclosure under Federal Rule

- 14 -

None of Plaintiffs' allegations of Jones' suppression or misrepresentation of evidence affects this evidence existed at the time of Lacy's arrest and do not affect the conclusion that probable cause existed with respect to the charge that Lacy committed an aggravated assault on Pink. Based on this evidence, no reasonable jury could conclude that probable cause to arrest and detain Lacy was lacking as to the aggravated assault charge. *See, e.g.*, *Meggs v. City of Berkley*, 246 Fed. App'x 402, 402-03 (9th Cir. 2007) (finding, at the summary judgment stage in a § 1983 action, that "no reasonable jury could conclude that [an] arrest was unsupported by probable cause"). Because probable cause existed to arrest Lacy based on the aggravated assault charges, Lacy's false arrest claim necessarily fails. Similarly, Lacy's unlawful detention claim also must fail. Therefore, summary judgment is granted in favor of Defendants on Plaintiffs' § 1983 false arrest and unlawful detention claims.

### 2. Malicious Prosecution

To prevail on the § 1983 claim that his homicide prosecution violated his civil rights, Lacy "must show that the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying [him] equal protection or another specific constitutional right." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995) (citations omitted). Even assuming that the malice and lack of probable cause elements can be met, the presumption of prosecutorial independence, which frequently bars a plaintiff's § 1983 malicious prosecution claim against an arresting officer, must still be rebutted.

> Ordinarily, the decision to file a criminal complaint is presumed to result from an independent determination of the prosecutor, and, thus, precludes liability for those who participated in the investigation or filed a report that resulted in initiation of proceedings. However, the presumption of prosecutorial independence does not bar a subsequent § 1983 claim against

---

of Civil Procedure 26(a)(2)(b) was nearly four months late, the affidavits and expert reports of Van Blaricom and Warren – Exhibits J and K (PSOF ¶¶ 18-20) – are excluded. *See* Fed. R. Civ. P. 37(c)(1); *Wong v. Regents of Univ. of Cal.*, 410 F.3d 1052, 1062 (9th Cir. 2005). At any rate, neither affidavit challenges the above facts that provide probable cause for the aggravated assault charge.

- 15 -

> state or local officials who improperly exerted pressure on him, knowingly provided misinformation to the prosecutor, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings.

*Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004). Malicious prosecution actions are not limited to suits against prosecutors, but may be "brought against other persons who have *wrongfully* caused the charges to be filed." *Id.* at 1066 (emphasis added) (citing *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126-27 (9th Cir. 2002)). The Tenth Circuit Court of Appeals, in an analogous case, noted, quoting Judge Posner:

> A prosecutor's decision to charge . . . [or] a prosecutor's decision not to drop charges but to proceed to trial . . . will not shield a police officer who *deliberately* supplied misleading information that influenced the decision . . . . If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors, or magistrates to confine or prosecute him. They cannot hide behind officials whom they have *defrauded*.

*Pierce v. Gilchrist*, 359 F.3d 1292, 1292 (10th Cir. 2004) (emphasis added) (quoting *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988)). Accordingly, the court held that "[t]he actions of a [third party] who prevaricates and distorts evidence to convince the prosecuting authorities to press charges is no less reprehensible than an officer who, through false statements, prevails upon a magistrate to issue a warrant . . . [because] . . . [i]n each case the government official maliciously abuses a position of trust to induce the criminal justice system to confine and then prosecute an innocent defendant." *Id.* at 1293.

Plaintiffs present no evidence establishing a genuine issue of material fact as to whether Jones exerted pressure on Sanders to prosecute Lacy, whether Jones provided misinformation to Sanders, whether Jones concealed exculpatory evidence, or whether Jones engaged in wrongful or bad faith conduct that was instrumental in causing the initiation of legal proceedings. *See Harper v. City of Los Angeles*, 533 F.3d 1010, 1028 (9th Cir. 2008) (holding that evidence rebutting the presumption of prosecutorial independence "must be substantial"). Regardless of what Jones' testimony may have been to the grand jury, Lacy submits no evidence that Sanders was unaware of the actual state and impact of the evidence

1  so that her independent judgment would have been influenced by any misinformation
2  provided by Jones. *See id.* Therefore, summary judgment is proper because there is no
3  evidence upon which a reasonable jury could find the presumption of prosecutorial
4  independence rebutted.

5  Because summary judgment is granted with respect to the claims directed against
6  Jones, and because the City cannot be held liable under § 1983 for police conduct that inflicts
7  no constitutional injury, *see City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986),
8  summary judgment is also granted to the City with respect to count four.

### 3.   **Fabrication of Evidence**

10  While Lacy has arguably raised a § 1983 claim involving the fabrication of evidence
11  in his response brief (*see* Dkt. # 151), that claim is pled only against Jones' co-defendant,
12  Phillip Keen, in the Complaint. (*See* Dkt. # 1 ¶ 105.) Even so, there is no evidence presented
13  by Plaintiffs that any fabrication of evidence on the part of Jones at the grand jury
14  proceedings resulted in the deprivation of Lacy's constitutional rights. Initially, Plaintiffs'
15  arguments bearing on Jones' failure to present certain exculpatory evidence to the grand jury
16  does not give rise to any actionable claim. *See United States v. Williams*, 504 U.S. 36, 50-55
17  (1992) (holding that the government is not required to present exculpatory evidence to the
18  grand jury). The only bases provided by Plaintiffs for asserting that keen fabricated evidence
19  is that Jones misrepresented the facts that: (1) the tissue found around the bullet hole in
20  Pink's shirt was found to be tissue belonging to Mayon; (2) the tissue found on the bullet was
21  found to be tissue belonging to Pink; and (3) Lacy admitted, during his interrogation, to
22  shooting his handgun horizontally. It is, however, undisputed that Lacy did agree during the
23  interrogation that he may have shot his gun horizontally and that the DNA testing indicated
24  that the tissue on the bullet was of the same tissue type as Pink and the tissue on Pink's shirt
25  was of the same tissue type as Mayon. While the identity of tissue type may not constitute
26  a "match," the Court is not persuaded that these statements present issues of grand jury
27  perjury. But, even if they did, there is no evidence that any of these acts resulted in any

constitutional deprivation or injury to Lacy. Therefore, to the extent that Plaintiffs could assert such a § 1983 claim, summary judgment is proper.

### C.     Count Eight – Derivative Claims

Debra Finley asserts a § 1983 claim against the Defendants for "deprivation of her substantive due process right to familial association with her natural son in violation of [the] First and Fourteenth Amendments."[15] (Dkt. # 36 at ¶ 139.) "[P]arents can challenge under section 1983 a state's severance of a parent-child relationship as interfering with their liberty interest in the companionship and society of their children." *Id.* The *Smith* court explained:

> [T]he state has no legitimate interest in interfering with this liberty interest through the use of excessive force by police officers. Such an action constitutes the very sort of affirmative abuse of government power which the substantive protections of the due process clause are designed to prevent. Therefore, the same allegation of excessive force giving rise to Mr. Smith's substantive due process claim based on his loss of life also gives the children a substantive due process claim based on their loss of his companionship.

*Smith*, 818 F.2d at 1420-21. Thus, if the violation of Finley's due process rights (i.e., the interference in her relationship with her son) was caused by violations to Lacy's own constitutional rights, Finley's claim is actionable. For Finley's claim to remain, there must be a predicate violation of Lacy's rights that would give rise to her claim. Because the Court grants summary judgment against both Jones and the City on all of Lacy's claims, Finley's claim against those Defendants likewise must fail.

---

[15]Debra Ann Finley also asserts a "deprivation of her due process right to be free from the onerous badge of infamy placed on her son caused by unconstitutional breaches of duty and criminal conduct by the government and its agents, which she vicariously suffers from within her community associations." (Dkt. # 36 at ¶ 140.) Plaintiff has failed to even mention such a claim in response to the motion for summary judgment. The Court is unaware of any case law supporting such a due process right. Regardless, because Plaintiffs have presented no arguments or basis for such a right, the Court finds that no such right would prevent summary judgment here.

1  **IT IS THEREFORE ORDERED** that the Motion for Summary Judgment of the
2  City of Phoenix and Ronald Jones (Dkt. # 113) is **GRANTED**.
3  DATED this 23rd day of December, 2008.

*/s/ G. Murray Snow*
G. Murray Snow
United States District Judge