1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                      FOR THE DISTRICT OF ARIZONA

8

9    BYRON TENNEL LACY, an unmarried )    No. CV-06-2865-PHX-GMS
     man, and DEBRA ANN FINLEY, his )
10   mother,                          )    **ORDER**
                                      )
11              Plaintiffs,           )
                                      )
12   vs.                              )
                                      )
13   COUNTY OF MARICOPA; THE CITY)
     OF PHOENIX; PHILLIP KEEN, M.D.;)
14   RONALD JONES,                    )
                                      )
15              Defendants.           )
     _____)

16

17          Pending before the Court is the Motion for Summary Judgment of Defendants County

18   of Maricopa and Phillip Keen. (Dkt. # 111.)  For the reasons set forth below, the Court grants

19   Defendants' motion in part and denies Defendants' motion in part.

20                              **BACKGROUND**

21   **I.    Facts**

22          On May 1, 1994, Shawn Mayon, a private security officer at the "Sister's" nightclub

23   located in Phoenix, Arizona, was shot and killed in the nightclub's parking lot.  Shortly after

24   the shooting, at approximately 4:00 a.m, Phoenix Police stopped a white Volvo station

25   wagon with four passengers, one of whom was Plaintiff Byron Lacy.  Lacy was arrested

26   under suspicion of his involvement in the nightclub shooting.  During a pat-down search,

27   Police found .45 caliber ammunition rounds in his left front pocket.  Police also recovered

28   a .45 caliber pistol from the rear seat of the Volvo.  That afternoon, Detective Ronald Jones

1 interviewed Lacy regarding the nightclub shooting. After relating several false stories, Lacy

2 admitted ownership of the .45 caliber pistol and that, earlier in the evening, he was at the

3 nightclub parking lot and fired his weapon multiple times. Lacy was subsequently released

4 from custody.

5     At the time of the shooting, Dr. Phillip Keen was employed as the Medical Examiner

6 for Maricopa County. Dr. Keen conducted an autopsy on Mayon's body on May 2, 1994.

7 The resulting report opined that the cause of Mayon's death was a gunshot wound caused by

8 a bullet that entered his head through his nose, passed through his brain, and exited the back

9 of his skull. (Dkt. 112 Ex. H at 1.) At Lacy's trial, Keen testified that during the autopsy

10 he used a ruler to measure the size of the defect in the back of Mayon's skull and was very

11 precise about his measurement. After the report was prepared, Keen testified that he

12 reviewed the contents before signing it. In the report, Keen stated that the exit wound from

13 the bullet "ranges up to 5/16 inch in greatest dimension." (*Id.* at Ex. H at 5.) The autopsy

14 report did not comment on the caliber of the bullet that passed through Mayon's skull. (*Id.*

15 Ex. H.) On January 25, 1995, Detective Jones, together with Prosecutor Teresa Sanders,

16 presented the case against Lacy to a grand jury. Jones testified from Keen's report that "the

17 cause of death [was] a single gunshot wound entering from the nose and exiting out the base

18 of the skull, slightly to the left of center, meaning the shot came forward and slightly to the

19 left." (Dkt. # 114 Ex. 1 at 12-13.) Based on the cumulative evidence, the grand jury indicted

20 Lacy on charges of murder in the first degree and aggravated assault, and a warrant was

21 issued for his arrest. (*Id.* at 35-36.)

22     During a pretrial interview, Keen advised Lacy's defense counsel of his 5/16"

23 measurement and admitted that it would be very atypical for a .45 caliber bullet to have

24 caused the defect in Lacy's skull. Approximately two weeks before Lacy's criminal trial was

25 to begin, Prosecutor Sanders contacted Keen in person to inform him that Lacy's expert,

26 Joseph Collier, would testify at trial that it is impossible for a .45 caliber bullet to exit

27 Mayon's skull through the 5/16" exit wound as reported from Keen's autopsy. Sanders

28 requested that Keen re-evaluate the defect size, suggesting that the 5/16" measurement could

have been a mistake because, based on her own measurements of the exit wound in a photograph that appeared smaller than scale, the exit wound appeared to be larger than 5/16". Keen reviewed the photograph, and concluded that the 5/16" measurement included in his report was likely inaccurate.  Keen and Sanders discussed his conclusions as well as a theory that would allow a .45 caliber bullet to pass through a defect that is smaller in diameter than the diameter of the bullet.  Keen relayed his revised conclusions to Sanders but did not issue a supplemental autopsy report, nor did he provide a written disclosure of his revised findings to the defense.  Sanders informed Keen that defense counsel for Lacy might contact him to inquire into the matter.  However, Lacy's defense counsel did not initiate contact with Keen.

At trial, Keen testified to his revised opinions of the size of the exit wound. Specifically Keen testified that he believed that his original 5/16" measurement of the exit wound was not correct:

> [b]ecause the [photo provided by Sanders was] taken of the wound itself without a scale, the defect in the photo is approximately 5/16s of an inch.  And the photo is not one to one in size of the dimensions of the skull.  In extrapolating back to skull sizes and other photos that do have scale in them, it is approximately one third under size.

(Dkt. # 157 Ex. B at 24.)  Keen testified that he could only state "that [the defect] is greater than 5/16s" but could not state "how much more it is than 5/16s." (*Id.* at 25.)  Lacy's counsel cross-examined Keen on the basis of his opinion and its late-breaking nature.  On cross-examination, Keen testified regarding his theory of how a .45 caliber bullet may have passed through Mayon's skull leaving a smaller diameter defect than the actual diameter of the bullet.  (*Id.* at 98-99.)  Lacy was convicted of reckless manslaughter and aggravated assault and was sentenced to seventeen years.  The conviction was affirmed on appeal.  Lacy then filed a petition for post-conviction relief in state court.  On October 25, 2002, the Arizona Superior Court granted the petition, set aside Lacy's conviction on grounds of ineffective assistance of counsel and insufficient evidence, and ordered a new trial.  Upon reassignment, the court determined that a new trial was improper because double jeopardy applied in light

of the insufficient evidence finding, and the court dismissed the charges against Lacy on February 23, 2004.

**II.    Procedural History**

In this action, Plaintiffs allege that Lacy's arrest, the investigation of the crime, and his prosecution were improper and deprived him of his constitutional rights.  On February 1, 2008, the Court dismissed counts one, two, four, five, seven, nine, and ten against Defendants Maricopa County and Phillip Keen.  (Dkt. # 64.)  Plaintiffs have since expressly abandoned count six.  (Dkt. # 149 at 16.)  Accordingly, the following counts against Defendants Maricopa County and Phillip Keen remain: count three (unconstitutional practice) and count eight (a derivative claim on behalf of Debra Finley for denial of familial association).  On June 24, 2008, Defendants Maricopa County and Phillip Keen filed a motion for summary judgment seeking judgment on the remaining counts.  (Dkt. # 111.)

**DISCUSSION**

**I.    Summary Judgment Standard of Review**

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Jesinger*, 24 F.3d at 1130.  In addition, the dispute must be genuine, that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

There is no issue for trial unless there is sufficient evidence favoring the nonmoving party; if the evidence is merely colorable or is not significantly probative, summary judgment may be granted.  *Anderson*, 477 U.S. at 249-50.  However, because "[c]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are

1  jury functions, not those of a judge, . . . [t]he evidence of the non-movant is to be believed,

2  and all justifiable inferences are to be drawn in his favor" at the summary judgment stage.

3  *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)); *Harris v.*

4  *Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999).

5  **II.    Analysis**

6          Defendants argue that they are entitled to summary judgment on the two remaining

7  counts.  Title 42 of the United States Code section 1983 governs all remaining claims against

8  these Defendants.  Section 1983 creates a cause of action against a person who, acting under

9  color of state law, deprives another of rights guaranteed under the Constitution.[1]  It does not

10  create any substantive rights; rather, it is a vehicle whereby plaintiffs can challenge actions

11  by government officials.  To prove a case under § 1983, Plaintiffs must demonstrate that (1)

12  the action occurred under color of state law[2] and (2) the action resulted in the deprivation of

13  a constitutional right or federal statutory right.  *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir.

14  2002).  "A person deprives another 'of a constitutional right, within the meaning of section

15  1983, if he does an affirmative act, participates in another's affirmative acts, or omits to

16  perform an act which he is legally required to do that causes the deprivation of which [the

17  plaintiff complains].'" *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (quoting *Johnson*

18  *v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)).

19

20          **A.    Count Three – Unconstitutional Practice**

21          In count three, Plaintiffs assert four possible bases for relief.  First, Plaintiffs argue

22  that "Keen's alter[ation] of his medical findings set forth in certified autopsy reports violated

23  _____

24          [1]42 U.S.C. § 1983 states, in relevant part: "Every person who, under color of any
    statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of

25  Columbia, subjects, or causes to be subjected, any citizen of the United States or other person
    within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities

26  secured by the Constitution and laws, shall be liable to the party injured in any action at law,
    suit in equity, or other proceeding for redress . . . ."

27

28          [2]Defendants do not contest that the conduct at issue occurred under color of state law.

1    . . . Lacy's due process right under the Fifth, Sixth, and Fourteenth Amendment to present

2    a 'complete defense.'"  (Dkt. # 1 Ex. A at ¶ 106.)  Second, Plaintiffs argue that "Keen

3    breached his statutory duty under A.R.S. § 11-597 by failing to prepare and file an accurate

4    autopsy report, and to accurately record critical medical/forensic measurements, which

5    violated Plaintiff Lacy's federally 'protected liberty interest' in this statute under the Due

6    Process Clause of the Fourteeth Amendment.  (*Id.* ¶ 107.)  Third, Plaintiffs argue that "Keen

7    . . . altered his medical findings . . . in order to support the State's theory of guilt."  (*Id.* ¶

8    105.)  As explained below, this claim is properly stated as a violation of due process.  Fourth,

9    Plaintiffs argue that "Keen testified to his 'altered findings in his autopsy report to support

10   [the] Detectives' 'single bullet' crime scene theory, and thereby to assist in the malicious

11   prosecution of Plaintiff Lacy."  (*Id.*  ¶ 108.)

12                    **1.      Right to Present a Complete Defense**

13            The Supreme Court has long recognized that "[w]hether rooted directly in the Due

14   Process Clause of the Fourteenth Amendment . . . or in the Compulsory Process or

15   Confrontation clauses of the Sixth Amendment, . . . the Constitution guarantees criminal

16   defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*,

17   476 U.S. 683, 690 (1986) (internal citations omitted) (quoting *California v. Trombetta*, 467

18   U.S. 479, 485 (1984)) ; *see also Washington v. Texas*, 388 U.S. 14, 19 (1967) (indicating that

19   "the right to present a defense" is a "fundamental element of due process law").

20            As Defendants' motion points out, Plaintiffs provide no evidence demonstrating that

21   Keen deprived Lacy of the right to present a complete defense.  At trial, Lacy had a

22   meaningful opportunity to fully cross examine the witnesses who testified against him and

23   to present witnesses and evidence on his own behalf.  There is no evidence that Keen or the

24   trial court unconstitutionally restricted Lacy's right to present his defense.  This conclusion

25   is supported by the findings of Judge Arellano on Lacy's motion for post-conviction relief.

26   At the evidentiary hearing, Judge Arellano found:

27                    The evidence clearly establishes that the defense counsel knew
                      of the change in the medical examiner's opinion. He was so
28                    advised telephonically by the deputy attorney.  The medical

- 6 -

examiner was a critical witness in this case. The information that the medical examiner was to convey and did, in fact, testify to was critical testimony. The Deputy County Attorney suggested to defense counsel that he re-interview the medical examiner. Defense counsel failed to do so. That amounts to fundamental error. Had defense counsel conducted a re-interview before or even during the trial, defense counsel would have been able to properly prepare to address the testimony. He could have addressed the testimony by proper preparation of his expert witness, proper presentation of an opening statement, proper preparation of cross-examination, and closing argument. In fact, the totality of the evidence establishes that defense counsel simply became angry and his performance was ineffective given the evidence at hand. That strategy was indefensible given that the defense attorney knew of the change in the medical examiner's opinion.

(Dkt. # 157 Ex. A at 110-11.)

The state court already granted Lacy relief after concluding that his defense counsel knew of Keen's revised opinion before trial and could have adequately prepared to address it, but failed to do so. Thus any infringement of Lacy's ability to present his case at trial resulted from his own attorney's failures. No conduct by Keen deprived Lacy of his ability to present a complete defense, or if it did, Plaintiffs fail to demonstrate how it may have done so. Plaintiffs make assertions of error within their brief, but never argue or explain how the evidence supports their "complete defense" claim. That is not the "specific[] and distinct[]" argument that is required. *See Indep. Towers of Wash. v. Wash.*, 350 F.3d 925, 930 (9th Cir. 2003). Therefore, the Court grants summary judgement to Keen and the County on Plaintiffs' § 1983 "complete defense" claim.

## 2. Protected Liberty Interest

Plaintiffs assert that "Dr. Keen breached his statutory duty under A.R.S. section 11-597 by failing to prepare and file an accurate autopsy report, and to accurately record critical medical/forensic measurements, which violated Plaintiff Lacy's federally 'protected liberty interest' in this statute under the Due Process Clause of the Fourteenth Amendment." (Dkt. # 36 ¶ 107.) Plaintiffs' assertion fails to state a valid due process claim because the Arizona statute does not create a constitutionally-protected liberty interest in Lacy to obtain an amendment to an autopsy report.

1    Ordinarily, a violation of state law cannot be a basis for a § 1983 action because §
2    1983 provides a remedy for "deprivation of rights secured by the Federal Constitution and
3    Laws." *Lovell* ex rel. *Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 370 (9th Cir. 1996);
4    *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982); *Cambell v. Burt*, 141 F.3d
5    927, 930 (9th Cir. 1998) ("As a general rule, a violation of state law does not lead to liability
6    under § 1983.").  Plaintiffs have failed to respond to the arguments advanced on this matter
7    by Defendants.

8    The Ninth Circuit has held that a state law must satisfy two requirements to create a
9    liberty interest protected by the Constitution.  "First, the law must set forth substantive
10   predicates to govern official decision making and, second, it must contain explicitly
11   mandatory language, i.e., a specific directive to the decision maker that mandates a particular
12   outcome if the substantive predicates have been met." *Valdez v. Rosenbaum*, 302 F.3d 1039,
13   1044 (9th Cir. 2002) (internal citations and quotations omitted).  The Supreme Court has
14   stated that a "'state creates a protected liberty interest by placing substantive limitations on
15   official discretion.'" *Cambell*, 141 F.3d at 930 (quoting *Olim v. Wakinekona*, 461 U.S. 238,
16   249 (1983)).  Here, the statute merely requires that "a full record or report of the facts
17   developed by [an] autopsy in the findings of the person performing the autopsy shall be
18   properly made and filed in the office of the county medical examiner or the board of
19   supervisors."  A.R.S. § 11-597(E).  This law does not set forth "substantive predicates to
20   govern official decision making," nor does it attempt in any way to constrain the judgment
21   or decision making of the medical examiner, or specifically direct any particular result.  It,
22   thus, does not create individual due process rights in state citizens.  *See Olim*, 461 U.S. at
23   250 ("The State may choose to require procedures for reasons other than protection against
24   deprivation of substantive rights, of course, but in making that choice the State does not
25   create an independent substantive right."); *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S.
26   748, 765 (2005) ("Making the actions of government employees obligatory can serve various
27   legitimate ends other than the conferral of a benefit on a specific class of people."); *Sandin*

28

1    *v. Conner*, 515 U.S. 472, 482 (1995) (finding no constitutionally-protected liberty interest

2    because state regulations "are not set forth solely to benefit the prisoner").

3          Plaintiffs cite no authority that supports a finding that Lacy has a due process liberty

4    interest in having medical examiners file amendments to their autopsy reports.  Additionally,

5    Plaintiffs do not explain how Keen's failure to amend his autopsy report would have resulted

6    in any constitutional harm to Lacy when he was otherwise informed of Keen's revised

7    opinions.  Even if Dr. Keen failed to follow Arizona statutory procedures as they apply to

8    medical examiners, there exists no basis under A.R.S. section 11-597(E) for a § 1983 claim.

9    Therefore, summary judgment is granted in favor of Defendants on any claim founded in

10   A.R.S. § 11-597(E).

11                   **3.      Intentional or Reckless Fabrication of Evidence**

12         Plaintiffs next argue that Keen intentionally or recklessly fabricated evidence when

13   he revised his opinions regarding his autopsy measurements just before trial.  (Dkt. # 149 at

14   14-16.)  Under the Fourteenth Amendment, there exists a "right not to be deprived of liberty

15   without due process of law, or more specifically, as the result of the fabrication of evidence

16   by a government officer acting in an investigative capacity."  *Pierce v. Gilchrist*, 359 F.3d

17   1279, 1285 (10th Cir. 2004); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir.

18   2001) (finding a due process right not to be subjected to criminal charges on the basis of false

19   evidence that was deliberately fabricated); *Zahrey v. Coffey*, 221 F.3d 342, 349 (2nd Cir.

20   2000) (recognizing a constitutional right "not to be deprived of liberty as a result of the

21   fabrication of evidence by a government officer acting in an investigating capacity.");

22   *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997) (holding that constitutional

23   rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists

24   that the false evidence would have affected the decision of the jury); *cf. Ricciuti v. New York*

25   *City Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) ("When a police officer creates false

26   information likely to influence a jury's decision and forwards that information to prosecutors,

27   he violates the accused's constitutional right to a fair trial . . . .").

28

1    The Ninth Circuit, in *Galbraith v. County of Santa Clara*, clarified the requisite

2    mental state for liability in this type of case.  307 F.3d 1119 (9th Cir. 2002).  There, a

3    plaintiff brought a § 1983 action against a county coroner, claiming that the coroner falsified

4    an autopsy report, leading to his false arrest and prosecution.  *Id.* at 1121.  In *Galbraith*, the

5    plaintiff's wife had been found dead and the investigating officers originally concluded that

6    the cause of death was suicide.  *Id.*  The defendant, Dr. Ozoa, the county's medical examiner,

7    performed an autopsy on the body and concluded that Galbraith's wife did not commit

8    suicide but was instead strangled.  *Id.* at 1122.  Ozoa's autopsy findings were communicated

9    to law enforcement and soon thereafter Galbraith was charged with murdering his wife.  *Id.*

10   Galbraith alleged that Ozoa's conclusion was a result of his incompetence and that Ozoa

11   deliberately attempted to cover up his incompetence from that point forward.  *Id.*  On motion,

12   under Federal Rule of Civil Procedure 12(b)(6), the Court relied on "authority holding that

13   government investigators may be liable for violating the Fourth Amendment when they

14   submit false and material information in a warrant affidavit."  *Id.* at 1126.  That authority

15   suggested that a "1983 plaintiff must show that the investigator made deliberately false

16   statements or *recklessly disregarded the truth* in the affidavit and that the falsifications were

17   material to the finding of probable cause."  *Id.* (quotations omitted) (emphases added).

18   Relying on these warrant affidavit cases, the Court held that, "a coroner's *reckless or*

19   *intentional falsification* of an autopsy report that plays a material role in the false arrest and

20   prosecution of an individual can support a claim under 42 U.S.C. § 1983 and the Fourth

21   Amendment."  *Id.* (emphasis added).

22   While the *Galbraith* court faced allegations of fabrications of evidence that led to

23   Fourth Amendment deprivations, the *Galbraith* standard is also applicable in this case.  Here,

24   there are allegations that a medical examiner formed revised opinions with reckless disregard

25   as to their truth and those allegations may have been both instrumental in the prosecutor's

26   charging decisions as well as material to the outcome of the trial. *See also Franks v.*

27   *Delaware*, 438 U.S. 154, 155-56 (1978) (employing a standard of "knowingly and

28   intentionally, or with reckless disregard for the truth," falsifying or omitting evidence in the

context of a Fourth Amendment challenge); *Pierce*, 359 F.3d at 1292 (holding that a plaintiff's allegations that a forensic chemist, "with knowing and reckless disregard for the truth," fabricated forensic evidence was sufficient to state a § 1983 claim under the Due Process Clause).

The question is thus, whether the facts in the record, when viewed in the light most favorable to Plaintiffs, permit the inference that, with reckless disregard for the truth, Keen incorrectly interpreted and revised his opinion on the size of the exit wound.  Because Plaintiffs bear the burden of proof in this matter, they must present sufficient evidence for a reasonable jury to conclude that Keen's revised opinions were developed with reckless disregard for the truth and were in fact incorrect.  To support such allegations, Plaintiffs must show that Keen "in fact entertained serious doubts as to the truth" of his revised measurements and opinions or that "circumstances evince obvious reasons to doubt the veracity" of those revisions.  *United States v. Ranney*, 298 F.3d 74, 78 (1st Cir. 2002).

Plaintiffs argue that the circumstantial evidence surrounding Keen's autopsy and the subsequent revision of his opinion implies that Keen's revised opinion and statements to Sanders were inaccurate and were recklessly fabricated.  According to Keen, he revised his opinions based on the following scenario:

> Approximately one week before the criminal trial was to begin, the prosecutor Ms. Theresa Sanders, contacted me and informed me that she had met with Mr. Lacy's defense counsel and he was maintaining it was impossible for a .45 caliber bullet to exit Mr. Mayon's skull through a 5/16" "defect" that I had noted in my autopsy report.  Ms. Sanders also inquired if the 5/16" measurement could have been a mistake.  She indicated that she had measured the "defect" in the unscaled autopsy photo and it appears to be about 5/16" and the photo appeared to be smaller than an actual skull size.  I informed Ms. Sanders that it was unusual, but not impossible, that a skull exit "defect" could measure smaller than the bullet diameter; especially in a case like Mr. Mayon where there are numerous small bone fractures near the "defect (i.e. displaced bone) which could hinge outward and allow the bullet to pass through and then hinge back, held by skin and hair, leaving an exit wound bone defect appearing to be smaller than the bullet caliber. . . . Subsequently, after review of the unscaled photo, I concluded that the 5/16" measurement of the exit "defect" was likely incorrect.

(Dkt. # 112 Ex. A.)

1    At Lacy's trial, Dr. Keen testified to the high level of care he exercised during the
2 initial autopsy in measuring the exit defect as 5/16". He further testified that he reviewed the
3 report before signing it and subsequently informed Lacy's defense counsel that the
4 measurement was 5/16" and that it would be very atypical for a .45 caliber bullet to have
5 caused the exit defect. Keen failed to photograph the defect with a ruler during the autopsy.
6 It was not until approximately a week before trial, after Sanders had been informed that the
7 defense and their experts were prepared to focus on the fact that a .45 caliber bullet could not
8 physically fit through a 5/16" exit defect, that Keen, at the suggestion of Sanders, reviewed
9 and revised his opinion as to the size of the defect. To the extent that Keen revised his
10 opinion as to the size of the defect based on the unscaled photograph shown him by the
11 prosecutor, it is unclear whether Keen had sufficient expertise in the field of reconstructing
12 measurements based on unscaled photographs to form such a revised opinion with adequate
13 regard for Lacy's rights. Had Keen not revised his opinion, it is unclear whether Sanders
14 would have pursued homicide charges against Lacy in light of the anticipated testimony by
15 defense experts. Given the circumstances surrounding the initial autopsy measurement and
16 subsequent revision, the Court cannot say that a reasonable jury could not infer that Keen's
17 revised opinions were in fact inaccurate and done with reckless indifference to both the truth
18 and Lacy's rights for the purpose of assisting the prosecution of Lacy. *See Ranney*, 298 F.3d
19 at 78.

20    In support of the veracity of Keen's revised opinion, Defendants provide the expert
21 witness report of Dr. Debra Komar. Dr. Komar, a forensic anthropologist, concludes that the
22 actual defect size was 14mm in diameter – 3mm larger than the diameter of a .45 caliber
23 bullet. Plaintiffs, however, submit an expert witness report of Dr. Karen Griest that assails
24 the methodology and conclusions of Dr. Komar. Additionally, Dr. Griest concludes that
25 "based on Dr. Keen's estimated exit wound size, no competent pathologist could conclude
26 that the defect in Mr. Mayon's skull was made by a .45 caliber bullet." (Dkt. # 161 Ex. C

27

28

¶ K(1).)  Here, a reasonable jury could infer that Dr. Komar's report is flawed in light of Dr. Griest's report.[3]

Defendants argue that "[a]ll of Plaintiff's § 1983 claims against Dr. Keen rest upon his trial testimony" and that Keen is entitled to absolute immunity from liability arising from that testimony.  The Supreme Court has extended absolute immunity to testifying witnesses, which would include Keen, at judicial proceedings.  *Briscoe v. LaHue*, 460 U.S. 325, 333 (1983).  It reasoned that without such immunity, "[a] witness's apprehension of subsequent damages liability might induce . . . self-censorship," either by making witnesses reluctant to come forward in the first place or by distorting their testimony.  *Id.*    Such self-censorship may "deprive the finder of fact of candid, objective, and undistorted evidence."  *Id.*

Even though Defendants are correct that Keen is entitled to absolute immunity for his trial testimony, *see id.* at 335-36; *Franklin v. Terr*, 201 F.3d 1098, 1101 (9th Cir. 2000), this immunity does not extend to the intentional or reckless pretrial fabrication of evidence.  *See Gregory v. City of Louisville*, 444 F.3d 725, 738-39 (6th Cir. 2006) ("Subsequent testimony cannot insulate previous fabrications of evidence merely because the testimony relies on that fabricated evidence.  The Court has never endorsed such a self-serving result.  Merely because a state actor compounds a constitutional wrong with another wrong which benefits from immunity is no reason to insulate the first constitutional wrong from the actions for redress.  This Court has consistently held that nontestimonial, pretrial acts do not benefit from absolute immunity, despite any connection these acts might have to later testimony.")

---

[3]Plaintiffs have filed a Motion to Strike Dr. Komar's Report. (Dkt. # 154.)  Plaintiffs argue that Dr. Komar's report should be stricken because it is not in affidavit form, because it does not set forth the qualifications of the witness, because it is hearsay, and because it is based on speculation. (Dkt. # 154 at 1.)  Defendants argue that Plaintiffs have waived their objections to Dr. Komar's report because Plaintiffs present another expert report that incorporates by reference the report of Dr. Komar. (Dkt. # 164 at 4.)  Whether the Court strikes the report of Dr. Komar is of no consequence, as the Court must view facts in the light most favorable to Plaintiffs and Plaintiffs have presented evidence that questions the methodology and conclusions of Dr. Komar.  Therefore, Plaintiffs' motion to strike is denied as moot.

1  (citation omitted); *Pierce v. Gilchrist*, 359 F.3d 1279, 1300 (10th Cir. 2004) (holding that an

2  action could proceed against a forensic hair examiner accused of intentionally or recklessly

3  falsifying her investigative report and recording a "match" when one did not exist); *Keko v.*

4  *Hingle*, 318 F.3d 639, 644 (5th Cir. 2003) (declining to extend absolute immunity to a

5  forensic examiner who allegedly falsified a forensic report); *Paine v. City of Lompoc*, 265

6  F.3d 975, 981 (9th Cir. 2001) (noting that absolute immunity "does not shield non-

7  testimonial conduct . . . . [P]olice officers . . . obviously enjoy no immunity for non-

8  testimonial acts such as fabricating evidence.") (internal quotations and citations omitted);

9  *Cunningham v. Gates*, 229 F.3d 1271, 1291 (9th Cir. 2000) (holding that "testimonial

10  immunity does not encompass non-testimonial acts such as fabricating evidence").

11      Here, it is undisputed that Keen's re-evaluation and disclosure of his revised opinion

12  to the prosecutor was a non-testimonial pretrial act.  Thus, it was not covered by the

13  immunity extended to witnesses at trial.  While it is true that Keen's testimony was the only

14  vehicle by which the allegedly fabricated evidence was introduced at trial, Lacy's claim

15  seeks not to impose liability based on Keen's testimony, but to impose liability arising from

16  the alleged fabrication itself and its pretrial effect on the prosecutor's decisions about what

17  charges to advance at trial.  *See Castellano v. Fragozo*, 352 F.3d 939, 958 n.107 (5th Cir.

18  2003) ("Defendants cannot shield any pretrial investigative work with the aegis of absolute

19  immunity merely because they later offered the fabricated evidence or testified at trial.");

20  *Hinchman v. Moore*, 312 F.3d 198, 205 (6th Cir. 2002) (holding that a municipal officer's

21  verbal fabrications as told to a state trooper and to prosecutors were not entitled to absolute

22  immunity, despite the officer's consistent testimony with these fabrications at the plaintiff's

23  later criminal proceedings).  Therefore, because there are issues of fact as to whether Keen

24  revised his opinion with reckless indifference to its truth and whether the revised opinion was

25  accurate, summary judgment is denied against Keen.

26              **4.      Malicious Prosecution**

27      Plaintiffs allege that Keen "testified to his 'altered' findings in his autopsy report to

28  support the Detectives' 'single bullet' crime scene theory, and thereby to assist in the

1  malicious prosecution of Plaintiff Lacy." (Dkt. # 1 Ex. A at ¶ 108.)  A claim for malicious
2  prosecution or abuse of process is not generally cognizable under § 1983 if process is
3  available within the state judicial system to provide a remedy.  *Usher v. City of Los Angeles*,
4  828 F.2d 556, 561 (9th Cir. 1987).  In order to prevail on the § 1983 claim that the homicide
5  prosecution violated his civil rights, Lacy "must show that the defendants prosecuted [him]
6  with malice and without probable cause, and that they did so for the purpose of denying
7  [him] equal protection or another specific constitutional right."  *Freeman v. City of Santa*
8  *Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995) (citations omitted).

9       Malicious prosecution actions are not limited to suits against prosecutors, but may also
10 be "brought against other persons who have wrongfully caused the charges to be filed."
11 *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) (citing *Galbraith*, 307 F.3d
12 at 1126-27).

13          Ordinarily, the decision to file a criminal complaint is presumed
            to result from an independent determination of the prosecutor,
14          and, thus, precludes liability for those who participated in the
            investigation or filed a report that resulted in initiation of
15          proceedings.   However, the presumption of prosecutorial
            independence does not bar a subsequent § 1983 claim against
16          state or local officials who improperly exerted pressure on him,
            knowingly provided misinformation to the prosecutor, concealed
17          exculpatory evidence, or otherwise engaged in wrongful or bad
            faith conduct that was actively instrumental in causing the
18          initiation of legal proceedings.

19 *Id.* at 1067.

20       Here, because Plaintiffs have presented sufficient facts to survive summary judgment
21 based on Keen's alleged fabrication of opinion evidence, Plaintiffs have also presented
22 sufficient facts to rebut the presumption of prosecutorial independence.  While *Awabdy* spoke
23 of bad faith conduct that is instrumental in "*causing the initiation*" of legal proceedings, *id.*,
24 the principle applies with equal force to one who engages in reckless conduct that is actively
25 instrumental in causing legal proceedings to be improperly maintained even if that conduct
26 played no role in the initiation of the legal proceedings.  Should a jury find that Keen's
27 statements to Sanders were incorrect and were made with reckless indifference to the truth,
28

1    the presumption of prosecutorial independence in maintaining and prosecuting homicide

2    charges will be successfully rebutted.

3           Despite this conclusion, Plaintiffs must still present evidence sufficient for a

4    reasonable jury to conclude that Keen acted with malice and with the intent to deprive Lacy

5    of a constitutional right and that probable cause to prosecute Lacy for homicide was lacking.

6    Thus, the relevant inquiry is whether the facts in the record, when viewed in the light most

7    favorable to Plaintiffs, permit the inference that (1) probable cause was lacking to prosecute

8    Lacy on homicide charges; (2) Keen acted with malice; and (3) Keen acted with the intent

9    to deprive Lacy of constitutional rights.

10          "Probable cause is a fluid concept – turning on the assessment of probabilities in

11   particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules."

12   *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *see also Pierce*, 359 F.3d at 1295 (asserting that

13   probable cause is a dynamic concept, as an investigation may result in accumulation of

14   evidence that changes the assessment of probability at a specific instance in time).  Probable

15   cause also requires consideration of the totality of facts known at the time a probable cause

16   determination is made.  *See Gregory*, 444 F.3d at 758 ("[D]eliberate obfuscation or omission

17   of material facts by an investigator at the preliminary hearing makes the investigator's

18   subsequent reliance on the hearing's conclusions unreasonable.") (citing *Albright v.  Oliver*,

19   510 U.S. 266, 280 (1994)); *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988) ("[P]olice

20   may rely on the totality of facts available to them in establishing probable cause, they also

21   may not disregard facts tending to dissipate probable cause"); *Kuehl v. Burtis*, 173 F.3d 646,

22   650 (8th Cir. 1999) ("[B]ecause the *totality* of the circumstances determines the existence of

23   probable cause, evidence that tends to negate the possibility that a suspect has committed a

24   crime is relevant to whether the officer has probable cause . . . even if substantial inculpatory

25   evidence (standing by itself) suggests that probable cause exists.").

26          Here, although the Grand Jury's indictment is probative of whether probable cause

27   existed to prosecute Lacy on homicide charges, it is undisputed that the Grand Jury was not

28   informed of Keen's autopsy report measurement indicating that the exit defect was smaller

1   in diameter than a .45 caliber bullet.  This potentially exculpatory evidence may not have

2   been fully appreciated by Sanders until the defense disclosed their plan to utilize Keen's

3   measurement in arguing that Lacy could not have been the shooter that killed Mayon.

4   Because a jury might conclude from the evidence that Keen recklessly fabricated evidence

5   at the time he subsequently met with the prosecutor, the jury could also conclude that

6   probable cause was lacking to prosecute Lacy for the murder of Mayon.

7        Similarly, if a jury finds that Keen recklessly fabricated evidence and finds that

8   probable cause to prosecute homicide charges was lacking, a reasonable jury could also infer

9   malice and intent to deprive Keen of constitutional rights. *Cf. New York Times Co. v.*

10  *Sullivan*, 376 U.S. 254, 280 (1964) (stating that malice may be found based upon a statement

11  that was known to be false or was made with reckless disregard for the truth).  Because

12  genuine issues of fact exist, Plaintiffs' malicious prosecution claim should also properly be

13  resolved by a jury.  Summary judgment is therefore denied on Plaintiffs' § 1983 malicious

14  prosecution claim against Keen.

15              **5.    Governmental Liability**

16       In count three, Plaintiffs allege that Defendant County of Maricopa is:

17              liable under 42 U.S.C. § 1983 for deprivations of Plaintiff
               Lacy's federal civil rights caused by Dr. Phillip Keen, as Chief
18             Medical Examiner for Maricopa County, the policymaker with
               final decision making authority for the Office of the Medical
19             Examiner, in that Plaintiff Lacy was unconstitutionally
               convicted . . . and imprisoned . . . in violation of the Fourth,
20             Fifth, Sixth, Eighth, and Fourteenth Amendments.

21  (Dkt. # 1 Ex. A at ¶ 109.)  The only remaining claims upon which the County might be liable

22  hinge on whether Keen recklessly fabricated evidence against Lacy.  Defendants argue that

23  Lacy cannot show that an official policy or custom was the driving force behind any of his

24  alleged constitutional deprivations.  (Dkt. # 163 at 4.)

25       A municipality or other local government entity may be sued for constitutional torts

26  committed by its officials according to an official policy, practice, or custom. *Monell v. N.Y.*

27  *City Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).  A litigant can establish a *Monell*

28  claim in one of three ways:

> (1) by showing a longstanding practice or custom which constitutes the standard procedure of the local governmental entity; (2) by showing that the decision-making official was, as a matter of state law, a final policy-making authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (3) by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate.

*Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 484 (1986).

Here, Plaintiffs assert that Keen was, as a matter of state law, a final policy-making authority whose edicts or acts may fairly be said to represent official policy in the area of decision.  Plaintiffs rely exclusively on *Pembaur*, (Dkt. # 149 at 12),  which held that "municipal liability may be imposed for a single decision by a municipal policymaker under appropriate circumstances."  475 U.S. at 470.  The Supreme Court has stated that "the conclusion that the action taken or directed by the municipality['s] . . . authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains."  *Bd. Of County Comm'rs v. Brown*, 520 U.S. 397, 405 (1997).

An official policymaker is one in whom state or local law vests the "authority to establish municipal policy with respect to the [relevant actions]," and such authority is "final."  *Id.*

In *Galbraith v. County of Santa Clara*, under similar facts, the Ninth Circuit held that a medical examiner "was a final policymaker for the municipality in the area of written autopsy reports," and that summary judgment was not proper for the defendant county under *Pembaur* for a medical examiner's falsification of an autopsy report, 231 Fed. App'x. 576, 577 (9th Cir. 2007).  (Dkt. # 149 at 13.)  Defendants argue that in *Galbraith* the issue did not relate to the medical examiner's conduct in falsifying an autopsy report, but only to whether the County of Santa Clara lacked training policies and procedures.  (Dkt. # 163 at 5.)  After careful review of *Galbraith*, however, it is apparent that the Ninth Circuit believed that a governmental liability claim based on a county medical examiner's conduct in falsifying

autopsy reports was a sufficient basis to reverse summary judgment in the county's favor. In Galbraith's brief to the Ninth Circuit, he argued two independent bases for municipal liability – one based on *Pembaur*, and one based on the county's custom of failing to train. *See* Brief of Petitioner-Appellant at 41-49, *Galbraith v. County of Santa Clara*, No. 06-16025, 2006 WL 3097094 (9th Cir. Aug. 25, 2006). The Ninth Circuit accepted either as a basis for reversing the summary judgment entered in favor of the county. The court held "that (1) Dr. Ozoa was a final policymaker for the municipality in the area of written autopsy reports and (2) there [was] a genuine issue of material fact as to whether the County's lack of training policies and procedures amounted to deliberate indifference to Galbraith's constitutional rights." *Galbraith*, 231 Fed. App'x. at 577 (citations omitted). Because Keen's position and conduct are sufficiently analogous to facts set forth in *Galbraith* as it pertains to Keen's role as a final policymaker in the area of autopsy reports, summary judgment in favor of Defendant County of Maricopa is not proper.[4]

## B.      Count Eight – Derivative Claims

Debra Ann Finley asserts a § 1983 claim against Defendants for "deprivation of her substantive due process right to familial association with her natural son in violation of [the] First and Fourteenth Amendments."[5]  (Dkt. # 36 at ¶ 139.)  The Ninth Circuit has held that

---

[4]During oral argument on this matter, counsel for Plaintiffs moved to amend his complaint to remove any reference to vicarious municipal liability and clarify his intent to assert direct municipal liability against the County of Maricopa. (Dkt. # 183.)  Because the Court has proceeded as if the matter were properly pled, the Court denies Plaintiffs' motion as moot.

[5]Debra Ann Finley also asserts a "deprivation of her due process right to be free from the onerous badge of infamy placed on her son caused by unconstitutional breaches of duty and criminal conduct by the government and its agents, which she vicariously suffers from within her community associations." (Dkt. # 36 at ¶ 140.)  Plaintiffs have failed to even mention such a claim in response to the motion for summary judgement.  The Court is unaware of any case law supporting such a due process right.  Because Plaintiffs have

1    "[P]arents can challenge under section 1983 a state's severance of a parent-child relationship

2    as interfering with their liberty interest in the companionship and society of their children."

3    *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987).  Thus, so long as the violation

4    of Finley's due process rights (i.e., the interference in her relationship with her son) was

5    caused by violations to Byron Lacy's own constitutional rights, Finley's claim is actionable.

6    *See id.* at 1420-21 ("[T]he state has no legitimate interest in interfering with this liberty

7    interest through the use of excessive force by police officers.  Such an action constitutes the

8    very sort of affirmative abuse of government power which the substantive protections of the

9    due process clause are designed to prevent.  Therefore, the same allegation of excessive force

10   giving rise to Mr. Smith's substantive due process claim based on his loss of life also gives

11   the children a substantive due process claim based on their loss of his companionship.").

12   Defendants' recognize this in stating that "[c]ount eight must be dismissed to the same extent

13   that the underlying claims of the Plaintiff, Bryon Lacy[,] against Dr. Keen and Maricopa

14   County are dismissed."  (Dkt. # 163 at 9.)   Therefore, summary judgment on count eight is

15   granted in favor of Maricopa County and Keen to the same extent summary judgment is

16   granted in favor of Defendants on count three.

17

18

19        **IT IS THEREFORE ORDERED** that the Motion for Summary Judgment of

20   Phillip Keen and the County of Maricopa (Dkt. # 111) is **GRANTED IN PART and**

21   **DENIED IN PART**.

22        **IT IS FURTHER ORDERED** that Plaintiffs' Motion to Strike (Dkt. # 154) and

23   Motion to Amend (Dkt. # 183) are **DENIED** as moot.

24        DATED this 23rd day of December, 2008.

25   _____
                         G. Murray Snow
26                   United States District Judge

27   _____

28   presented no arguments or basis for such a right, the Court deems the argument waived.